NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| RP BAKING LLC,<br><br>                 **Plaintiff,**<br><br>        v.<br><br>BAKERY DRIVERS AND SALESMEN LOCAL 194 AND INDUSTRY PENSION FUND and its TRUSTEES,<br><br>                 **Defendants.** | Civil Action No.: 10-3819 (ES)<br><br>**<u>OPINION</u>** |

<u>SALAS, DISTRICT JUDGE</u>

**I.    Introduction**

Pending before this Court is RP Baking LLC's ("RP") motion to dismiss Bakery Drivers and Salesmen Local 194 and Industry Pension Fund and its Trustees' (the "Fund") First Amended Counterclaim. The Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. §§ 1132 and 1451, Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Court has reviewed the parties' submissions in connection with the motion and decides it without oral argument under Fed. R. Civ. P. 78(b). For the following reasons, the Court DENIES RP's motion, and Counts I, II, and III in the Amended Counterclaim survive.

**II.    Background**

The Fund alleges that it is a multiemployer pension plan within the meaning of §§ 3(37) and 4001(a)(3) of ERISA, 29 U.S.C. § 1002(37) and 1301(a)(3). The individual Trustees of the fund are "fiduciaries" with respect to the Fund as defined in § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and are collectively the "plan sponsor" within the meaning

of § 4001(a)(10)(A) of ERISA, 29 U.S.C. § 1301(a)(10)(A). Under §§ 502(a), 4221(b)(1), and 4301(a)(1), 29 U.S.C. §§ 1132(a), 1401(b)(1), and 1451(a)(1), the Fund filed this Amended Counterclaim on behalf of the Fund, its participants, and beneficiaries for the purpose of collecting withdrawal liability. (Am. Counterclaim ¶¶ 3-7, D.E. 46).

The Fund alleges that until the date of its withdrawal from the Fund in June 2006, Pechter's Baking Group, LLC ("Pechter's") employed workers represented for the purposes of collective bargaining by the Bakery Drivers and Salesmen Local 194, which later merged into the International Brotherhood of Teamsters Local 701. (*Id.* ¶ 9, 11). Pechter's was signatory to a collective bargaining agreement ("CBA") with Local 701, under which Pechter's was required to make contributions to the Fund on behalf of its employees. (*Id.* ¶ 12). Via an asset purchase agreement ("APA"), RP purchased the assets of Pechter's relating to Pechter's manufacture, sale, and distribution of baked goods, on or about June 26, 2006. (*Id.* ¶ 17). The Fund alleges that, in the APA, RP agreed to assume Pechter's collective bargaining agreement with Local 701, and began making contributions to the Fund on behalf of its employees. (*Id.* ¶ 18).

The Fund determined that, in June 2006, Pechter's effected a "complete withdrawal" from the Fund under § 4203 of ERISA, 29 U.S.C. § 1383. (*Id.* ¶ 13). The Fund also determined that as a result of Pechter's withdrawal, Pechter's incurred withdrawal liability to the Fund in the amount of $5,440,183, as determined under § 4201(b) of ERISA, 29 U.S.C. § 1381(b). (*Id.* ¶ 14). On or about November 16, 2007, Pechter's received a demand for payment of withdrawal liability issued by the Fund in accordance with §§ 4202(2) and 4219(b)(1) of ERISA, 29 U.S.C. §§ 1382(2) and 1399(b)(1). The demand also contained a withdrawal liability payment schedule. (*Id.* ¶¶ 15-16).

On or about January 6, 2010, RP received a demand for payment of withdrawal liability issued by the Fund in accordance with §§ 4202(2) and 4219(b)(1) of ERISA, 29 U.S.C. §§ 1382(2) and 1399(b)(1), informing RP that as the successor to Pechter's, RP was liable for Pechter's withdrawal liability of $5,448,183, payable in a single payment or in 39 quarterly payments of $184,982, which included a final payment of $147,286.  (*Id.* ¶ 61).  RP requested plan sponsor review of the withdrawal liability assessment by letter dated February 22, 2010. (*Id.* ¶ 62).  By letter mailed on May 21, 2010, the Fund denied all aspects of RP's request for review.   (*Id.* ¶ 63).  By letter dated and received July 23, 2010, RP initiated arbitration of the withdrawal liability assessments.  (*Id.* ¶ 64).

Two allegations are at the core of the Fund's Amended Counterclaim.  First, under Count I, the Fund alleges that RP, as successor-buyer, is liable for the withdrawal liability of Pechter's, as predecessor-buyer.  (*Id.* Count I ¶¶ 70-74).[1]  Second, and more critically for purposes of this Opinion, the Fund alleges that, based on the above dates, and given the 60-day timeline for initiating arbitration under § 1401(a)(1)(A), RP untimely requested arbitration, cannot request it now, and is therefore stuck with the payments and schedule set forth by the Fund in its demand. The focus of Count II is RP's alleged $1,005,674 of withdrawal liability related to *RP's own withdrawal* in October 2008, for which the Fund assessed a liability of $1,005,674 against RP in a demand letter received by RP on or about January 6, 2010.  (Am. Counterclaim Count II ¶¶ 75-87).  Finally, in Count III the Fund requests declaratory relief, alleging that, because of RP's untimely arbitration request, RP is precluded from challenging the Fund's assessments and

---

[1] Accompanying this Opinion related to RP's motion to dismiss the Fund's Amended Counterclaim is an additional Opinion relating to the parties' cross motions for summary judgment on this very issue.  Because that Opinion treats in depth the issue of successor liability under Rule 56, the Court only addresses the issue briefly below to account for the different standard under Rule 12(b)(6).

schedules for payment against RP for Pechter's and for RP's own withdrawal. (*Id.* Count III ¶¶ 88-92). The Court includes additional facts below, where relevant to the issues discussed.

### III. Legal Standards

#### A. Rule 12(b)(6)

For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining the sufficiency of a complaint, the Court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). But, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[;][t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

#### B. Withdrawal and Successor Liability

ERISA is designed "to protect plan participants and their beneficiaries." *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 96 (3d Cir. 2011) (citations omitted). The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") addresses "the adverse consequences that result when individual employers terminate their participation or withdraw from multiemployer pension plans." *Id.* (citing *Supervalu, Inc. v. Bd. of Trs.*, 500 F.3d 334, 336 (3d Cir. 2007)). The MPPAA requires an employer who withdraws from a multiemployer pension plan to pay withdrawal liability, which represents the fund's "unfunded vested benefits." 29 U.S.C. §§ 1381, 1382(3), 1399(b)(1)(B). The plan sponsor first determines if the employer has withdrawn. 29 U.S.C. § 1381. Next, the plan sponsor will notify the employer of the amount of the alleged

withdrawal liability. 29 U.S.C. §§ 1382(2), 1399(b)(1)(A)(i). After notification, within ninety days, the employer may seek a review of the amount. 29 U.S.C. § 1399(b)(2)(A)(i). If any dispute remains, either party may initiate arbitration. 29 U.S.C. § 1401(a)(1). If neither party initiates arbitration, then the amounts immediately become due and owing and subject to collection. 29 U.S.C. § 1401(b)(1).

Under the theory of successor liability, "a purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where [1] the buyer had notice of the liability prior to the sale and [2] there exists sufficient evidence of continuity of operations between the buyer and seller." *Einhorn*, 632 F.3d at 99 (adopting the Seventh Circuit's rule in *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir. 1990)). "The inquiry should be effectuated on a case by case basis balancing the equities presently before the court." *Id.*[2]

---

[2] On July 18, 2011, the Court held, "Defendants can seek to hold Plaintiff liable for Pechter's withdrawal liability under a theory of successor liability." *RP Baking LLC v. Bakery Drivers & Salesmen Local 194 (RP Baking I)*, No. 10-3819, 2011 WL 2912861, at *3 (D.N.J. July 18, 2011) (D.E. 38). In that Opinion, the Court reasoned that although *Einhorn* "deals with the issue of successor liability in the context of delinquent payments, the Third Circuit favorably cited a District of Utah case which permitted successor liability in the context of withdrawal liability." *Id.* (citing *Trs. of the Utah Carpenters' & Cement Masons' Pension Trust v. Daw, Inc.*, No. 07-87, 2009 WL 77856, at *3 (D. Utah Jan. 7, 2009) ("A successor company may be charged with the predecessor's withdrawal liability.")). Other courts, including the Seventh Circuit, whose rule and rationale the Third Circuit adopted, have also held that withdrawal liability can give rise to successor liability."). *See Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Exp., Inc.*, 223 F.3d 483, 492 (7th Cir. 2000) ("Cases construing the MPPAA have held that successors in non-exempt sales may be liable for withdrawal liability."); *Artistic Carton Co. v. Paper Indus. Union Mgmt. Pension Fund*, 971 F.2d 1346, 1352 (7th Cir. 1992) ("[Section 4204] identifies conditions under which 'withdrawal' does not occur, and under which the trust therefore may not assess withdrawal liability against the old owner. It creates an immunity for sellers that meet its conditions. It does not create any immunity for buyers under any circumstances."). Additionally, the rule comports with the Third Circuit's statement that "[w]e have recognized that because ERISA and the MPPAA are remedial statutes, they 'should be liberally construed in favor of protecting the participants in employee benefit plans.'" *Einhorn*, 632 F.3d at 98 (quoting *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)).

## IV. Discussion

### A. Count I—Claim Against RP for Pechter's Withdrawal: Successor Liability

Where relevant, the Court incorporates its Opinion denying the parties' cross motions for summary judgment (*i.e*, the Opinion denying D.E. 43 and D.E. 51). In that Opinion, the Court found that the Fund had not satisfied its burden on summary judgment, but the survival standard on a motion to dismiss is, of course, different. To survive RP's motion to dismiss Count I, the Amended Counterclaim need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 570). Here, Count I satisfies that standard.

The first element of a successor liability claim in the ERISA context is that "the buyer had notice of the liability prior to the sale." *Einhorn*, 632 F.3d at 99. In this Court's July 18, 2011 Opinion, it held:

> [The Fund] ha[s] not pled any facts to support its contention that [RP] had notice of Pechter's withdrawal liability. [The Fund] merely pled that [RP] had "prior notice of the possibility of Pechter's withdrawal liability" without further factual support. Although [the Fund] pled that [RP] had knowledge of Pechter's obligations under the collective bargaining agreement, it did not specifically tie those obligations to withdrawal liability to give [RP] fair notice of the support for [the Fund's] claims. Finally, although the Court agrees that [RP's] disclaimer of such liability is relevant, the Court cannot find where [the Fund] pled those facts in the Counterclaim.

*RP Baking LLC v. Bakery Drivers & Salesmen Local 194 (RP Baking I)*, No. 10-3819, 2011 WL 2912861, at *4 (D.N.J. July 18, 2011). The Court finds that the Fund has now cured those deficiencies.

The Fund's core allegation is that "RP had notice of Pechter's obligations to the Fund prior to its purchase of Pechter's assets as a result, *inter alia*, of its assumption of Pechter's collective bargaining agreement with Local 701 under the APA," (Am. Counterclaim ¶ 19), and

that "RP also had notice of Pechter's potential future withdrawal liability prior to its purchase of the [sic] Pechter's assets." (*Id.* ¶ 20). The Fund then supports these allegations in three ways. First, the Fund alleges that RP's counsel sent Pechter's counsel an email on April 11, 2006 requesting a disclaimer of "any assumption by RP of withdrawal liability incurred by Pechter's and indemnifying RP for any such withdrawal liability." (*Id.* ¶ 21(a), (b)). Second, the Fund alleges that the requested changes were added to the APA as a result of the email. (*Id.* ¶¶ 22-23). Third, the Fund alleges, "[b]efore the APA was executed, RP did not seek nor did it request that Pechter's seek an estimate of Pechter's potential withdrawal liability from the Fund." (*Id.* ¶ 24). "Accept[ing] all well-pleaded factual allegations in the complaint as true and draw[ing] all reasonable inferences in favor of" the Fund, *Phillips*, 515 F.3d at 231, it is plausible that RP learned of Pechter's withdrawal liability debts prior to the sale of assets, decided not to request an estimate of those debts, and used contractual protections to avoid payment. Accordingly, the notice element is satisfied for purposes of Rule 12(b)(6).

The second element of a successor liability claim is that "there exists sufficient evidence of continuity of operations between the buyer and seller." *Einhorn*, 632 F.3d at 99. In its July 18, 2011 Opinion on RP's motion to dismiss, the Court found that the initial counterclaim satisfied this element. *See RP Baking I*, 2011 WL 2912861, at *4. The Court finds that because the Amended Counterclaim contains the same continuity-related allegations as the initial counterclaim, the element is satisfied here for the reasons set forth in that opinion.

    **B.    Count II—Claim Against RP for RP's Withdrawal:
          RP's Alleged Untimely Request for Arbitration**

Count II is a claim against RP for RP's own withdrawal from the Fund in October 2008, when RP "effected a 'complete withdrawal' from the Fund as defined in Section 4203 of ERISA, 29 U.S.C. § 1383." (Am. Counterclaim ¶ 77). In its January 6, 2010 demand to RP for payment

of RP's withdrawal liability, the Fund "determined that as a result of RP's withdrawal, RP incurred withdrawal liability to the Fund in the amount of $1,005,674, as determined under Section 4201(b) of ERISA, 29 U.S.C. § 1381(b)." (*Id.* ¶ 78-80). In its demand, the Fund also set forth RP's payment schedule. (*Id.*). RP challenged the assessment in the Fund's demand "by letter dated February 22, 2010." (*Id.* ¶ 81). The Fund denied RP's request "[b]y letter mailed on May 21, 2010." (*Id.* ¶ 82). Next, RP "purported to initiate arbitration of the withdrawal liability assessments," "[b]y letter dated and received July 23, 2010." (*Id.* ¶ 83). Critically, for purposes of Count II, the Fund alleges that "RP failed to initiate arbitration within the time period specified in Section 4221(a)(1) of ERISA," that RP is now precluded from doing so, and therefore is stuck with the Fund's assessment and payment schedule set forth in the Fund's demand. (*Id.* ¶ 83-87). At its core, Count II is a request for "an injunction requiring RP to pay all payments when they become due in accordance with the Payment Schedule for RP's Withdrawal and enjoining RP from proceeding with arbitration due to its failure to timely initiate arbitration." (*Id.* ¶ 87(b)).

RP's primary argument on dismissal is that Count II must be dismissed because no alleged facts plausibly suggest that RP failed to timely initiate arbitration. (RP's Moving Br., D.E. 50 at 14-17). The Fund argues that it does plead facts plausibly supporting RP's untimely request for arbitration. (Fund's Opp. Br., D.E. 59 at 13-19). As a result, the Fund argues, RP must pay the amount of withdrawal liability set forth in the Fund's demand, RP must pay on the schedule set forth in the demand, and "RP is precluded from challenging the amount or the schedule. (*Id.* at 13).

For purposes of Rule 12(b)(6), the Court must determine whether (1) the statutes cited in the Amended Counterclaim plausibly support this preclusion argument; (2) whether the Fund has

adequately alleged dates plausibly supporting the untimeliness of RP's request for arbitration; and (3), most critically, whether controlling authority eliminates the possibility that RP's request was untimely.

First, the statutes cited in the Amended Counterclaim do support the Fund's preclusion theory. Section 1401(a)(1) establishes arbitration as the means of disputing the Fund's determinations of withdrawal liability:

> Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration. Either party may initiate the arbitration proceeding within a 60-day period after the earlier of—(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or (B) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title.

Section 1401(b)(1) establishes that failure to timely initiate arbitration precludes a challenge:

> If no arbitration proceeding has been initiated pursuant to subsection (a) [of this section], the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor.

Taken together, these set forth a plausible legal basis for Count II.

Second, the Court finds that the Fund has plausibly alleged dates supporting its theory that RP's request for arbitration was untimely. "'Arbitration must be initiated within 60 days following the earlier of 'the date of notification to the employer under [29 U.S.C.] section 1399(b)(2)(B),' or '120 days after the date of the employer's request [for review] under [29 U.S.C.] section 1399(b)(2)(A).' 29 U.S.C. § 1401(a)(1).'" *Doherty v. Teamsters Pension Trust Fund of Phila. & Vicinity*, 16 F.3d 1386, 1391 (3d Cir. 1994) (alterations in the original). Here, the parties agree that the 60-day period runs from the date of notification. (*See* RP's Moving Br. at 15; Fund's Opp. Br. at 15). Therefore, the Court reviews the allegations in the Amended Counterclaim to determine whether the dates plausibly support that RP's request was untimely, and the Court finds that it has. The Fund alleges that RP requested review by letter "dated

February 22, 2010," (Am. Counterclaim ¶ 81), that the Fund denied all aspects of RP's request for review in a letter "mailed on May 21, 2010," (*id.* ¶ 82), and that "RP purported to initiate arbitration of the withdrawal liability assessments" by letter "dated and received July 23, 2010." (*Id.* ¶ 83). If RP received notice under § 1401(a)(1)(A) when the Fund mailed its denial on May 21, 2010, then RP's request for arbitration dated and received July 23, 2010—63 days later— could plausibly be considered untimely.

Third, and most importantly, the Fund's theory of untimeliness is not—as RP claims— precluded by controlling precedent. RP argues that under § 1401 and the Third Circuit's decision in *Doherty*, 16 F.3d at 1391, notice occurred when RP *received* the Fund's denial. With that legal foundation, RP argues that the Fund makes no "factual allegation plausibly suggesting that RP *received* the Fund's notification regarding withdrawal liability more than sixty days earlier, on or before May 23, 2010." (RP's Moving Br. at 16) (emphasis added). Essentially, RP challenges the alleged start date for the 60-day clock set forth by the Fund (May 21), points to the fact that the Fund makes no allegation as to when the May 21, 2010 letter was received by RP, and concludes that the Fund does not allege a plausible basis for the assertion that RP's July 23, 2010 arbitration request was untimely. Not surprisingly, the Fund argues that the 60-day clock started when the letter was *mailed* and *dated* (May 21), and therefore RP's July 23, 2010 arbitration request was untimely, occurring more than 60 days later. (Fund's Opp. Br. at 15).

To support its argument, RP argues that *Doherty* controls because in that case the Third Circuit "concluded [that] the 'date of notification' under 29 U.S.C. § 1401(a)(1) is when the employer 'received notification' from the plan sponsor." (RP's Moving Br. at 16 (citing *Doherty*, 16 F.3d at 1391)). However, reviewing this statement from *Doherty* in context, the Court is not convinced that the decision set forth a clear "receipt" rule. In *Doherty*, "[t]he Fund

affirmed its decision on review by letter *dated* January 30, 1992." 16 F.3d at 1388 (emphasis added). Later in its discussion, the court stated, "[a]ppellants *received notification* on January 30, 1992." *Id.* at 1391 (emphasis added). Therefore, it appears that the court equated notification with the letter's *date*; therefore, it is not true that *Doherty* clearly set forth a date-received rule.[3] The parties do not cite, and the Court has not found, any other controlling statutes or cases that explicitly answer the question of whether notice under § 1401(a)(1)(A) occurs on the letter date, the date mailed, or the date received. The parties do marshal non-binding case law and statutory construction arguments in support of their respective positions, (*see* RP's Moving Br. at 14-16; Fund's Opp. Br. at 14-19), but, at the motion to dismiss stage, it is not necessary for the Court to decide whose position is more persuasive. At this stage, it is sufficient to find that the allegations in the Fund's Amended Counterclaim are plausibly supported. Accordingly, RP's motion to dismiss this Count is denied.[4]

---

[3] It is, of course, possible that in *Doherty* the January 30, 1992 letter was dated, sent, *and received* on the same day. This would mean that *Doherty* was ambiguous with respect to whether the Third Circuit treated January 30 as the date of notice based on the date mailed, the letter's date, or the date received. The Court's review of *Doherty*, however, does not reveal facts on which to conclusively make this determination, and, more importantly, the parties do not point to such facts. For purposes of RP's motion to dismiss, the important point is that *Doherty* does not compel the conclusion that the date of notice is the date received, and therefore it cannot be said that the Fund's Count fails as a matter of law.

   The Court also notes—without explicitly deciding the issue, because it need not decide the issue at this stage—that its review of the decisions cited by both parties reveals that because of the harsh results of failing to comply with the strict 60-day rule, the date-received rule appears to be more logical than the date-mailed rule. *See*, *e.g.*, *Central States v. Carstensen Freight Lines, Inc.*, No. 99-2256, 2000 U.S. App. LEXIS 16212, at *5 (7th Cir. July 10, 2000) ("[T]he employer must seek arbitration within 60 days *of its receipt* of the plan's decision . . . .") (emphasis added); *Trs. of the Sheet Metal Workers Local Union No. 80 Pension Trust Fund v. W.G. Heating & Cooling*, 555 F. Supp. 2d 838, 853 (E.D. Mich. 2008) (citing *Central States* for the date-received rule, and explaining that "[t]he weight of appellate authority holds that an employer that fails to initiate arbitration in a timely manner waives defenses and objections that could have been raised in arbitration"); *but see*, *e.g.*, *Lowen v. Keystone Shipping Co.*, No. 88-8905, 1989 U.S. Dist. LEXIS 9596, at *8 (E.D. Pa. Aug. 11, 1989) (calculating the 60-day period from the date on the fund's demand).

[4] RP also argues that Count II should be dismissed because the fund seeks to collect an amount in excess of the amount specified by statute, and "a court should not enforce an interim payment obligation where the Fund's assertion is completely unfounded." (RP's Moving Br. at 17 (citing *Flying Tiger Line v. Teamsters Pension Trust Fund of Phila.*, 830 F.2d 1241, 1251 (3d Cir. 1987))). The general rule under 29 U.S.C. § 1399(c)(2) is that "[w]ithdrawal liability *shall* be payable in accordance with the schedule set forth by the plan sponsor." *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 140 (3d Cir. 1997) (emphasis in original). In *Galgay*, the Court rejected the

### C.  Count III—Declaratory Relief Related to Pechter's and RP's Own Withdrawal

Count III is a claim for declaratory judgment that "RP failed to initiate arbitration of Pechter's withdrawal liability within the time period specified in [§] 4221(a)(1) of ERISA, and is now precluded from doing so," and therefore cannot challenge the amount or the schedule of withdrawal liability set forth by the Fund in its January 6, 2010 demand letter.  (Am. Counterclaim ¶¶ 89-90).  Because the Court has already determined that Counts I and II will survive, the Court finds that Count III will also survive because Count III simply combines the successor liability feature of Count I and the untimeliness feature of Count II.

### V.  Conclusion

For the foregoing reasons, the Court will deny RP's motion to dismiss the Counts in the Fund's Amended Counterclaim.  An accompanying Order will follow.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

---

employer's frivolity argument, and stated, "[w]e have never held that there are any equitable exceptions to the statutory provisions on interim payment."  *Id.*  The Third Circuit also stated, "[o]ur jurisdiction is limited to ordering the employer to make interim payments once the pension fund has demonstrated that it [1] complied with the statutory requirements for calculating liability and [2] notif[ied] the employer."  At the motion to dismiss stage, therefore, so long as the Fund alleges that it complied with the statutory calculations and notified the employer, the claim would survive.  Here, the Fund has done so by alleging that its calculations were performed in accordance with § 1399, (Am. Counterclaim ¶¶ 15, 61, 79), and notified RP.  (*Id.* ¶¶ 15, 61, 79-80).  The merits of the calculation itself are not properly before the Court, and because discovery on the issue of RP's timeliness will determine whether the calculation goes before the arbitrator, the Court will not review them now.