NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| **RP BAKING LLC,** | : | |
| | : | **Civil Action No.: 10-3819 (ES)** |
| **Plaintiff,** | : | |
| | : | **OPINION** |
| **v.** | : | |
| | : | |
| **BAKERY DRIVERS AND SALESMEN** | : | |
| **LOCAL 194 AND INDUSTRY** | : | |
| **PENSION FUND and its TRUSTEES,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**SALAS, DISTRICT JUDGE**

## I.      Introduction

Pending before this Court is RP Baking LLC's ("Plaintiff" or "RP") motion for summary judgment, (D.E. 43-1), and Bakery Drivers and Salesmen Local 194 and Industry Pension Fund and its Trustees' ("Defendants" or "the Fund") cross motion for summary judgment. (D.E. 51). The Court has jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. §§ 1132 and 1451, Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Court has reviewed RP's declaratory judgment Complaint, (D.E. 1), RP's moving brief, (D.E. 43-1, "RP's Moving Br."), RP's statement of undisputed material facts in support of its motion, (D.E. 43-2, "RP's Moving SOF"), Defendants' opposition brief and cross motion, (D.E. 51, "Fund's Opp. Br."), Defendants' response to RP's statement of undisputed material facts and additional material facts, (D.E. 51-1, "Fund's Opp. SOF"), RP's reply brief, (D.E. 54, "RP's Reply Br."), RP's response to Defendants' statement of additional material facts, (D.E. 54-1, "Fund's Reply SOF"), and all accompanying exhibits, including interrogatories, declarations, and stipulations. The

Court decides the motion on the papers without oral argument under Fed. R. Civ. P. 78(b).  For the following reasons, the Court DENIES RP's motion, (D.E. 43-1), and the Court DENIES Defendants' cross motion.  (D.E. 51).  The key finding in the following Opinion is that genuine issues of material fact exist, precluding a finding as a matter of law on whether there exists sufficient evidence of continuity of operations between the buyer, RP, and the seller, Pechter's, to support a theory of successor liability.

## II.    Background

The Court writes for the parties, who are familiar with the facts of the case, and therefore the facts are presented here in summary fashion, with additional facts included in the relevant portions of the Court's analysis below.

Pechter's Baking Group, L.L.C. ("Pechter's") was a commercial bakery employing approximately 150 people that supplied bread, rolls, and pastries to much of the New York metropolitan area.  (RP's Moving SOF ¶ 1).  As of June 2006, Pechter's was party to a collective bargaining agreement ("CBA") with the Bakery Drivers and Salesmen Local 194 (the "Union").  (*Id.* ¶ 2).  Pechter's was obligated to make contributions to the Union's Fund, which was regulated by ERISA.  (*Id.* ¶ 3).  Under the CBA, Pechter's contributed to the Fund on behalf of Pechter's employees.  (*Id.* ¶ 4).  On May 5, 2006, RP entered into an asset purchase agreement ("APA") with Pechter's.  (*Id.* ¶ 7).  The sale closed on June 26, 2006.  (*Id.*).  As a result of the asset sale, the Fund determined that in June 2006, Pechter's affected a "complete withdrawal" from the Fund, as a result of which, Pechter's incurred withdrawal liability to the Fund in the amount of $5,440,183.  (RP's Reply SOF ¶¶ 40-41).  On or about November 16, 2007, Pechter's received a Demand for payment of withdrawal liability from the Fund, setting forth the amount of liability and a payment schedule.  (*Id.* ¶ 42).  Because Pechter's has not made any payments to

the Fund for its withdrawal liability, (*id.* ¶ 43), the Fund is pursuing RP on a theory of successor liability, as Pechter's successor following the APA.

To thwart successor liability, RP filed a declaratory judgment complaint, seeking, *inter alia*, "[a] declaratory judgment in RP's favor that it is not liable as a successor for Pecther's unpaid withdrawal liability." (Compl. at 6, filed July 29, 2010).  On July 27, 2011, RP moved for summary judgment, arguing against a finding of successor liability because there is no evidence that RP sought to "cheat" the Fund out of pension contributions; because RP did not have prior notice of a withdrawal liability that predated the signing of the Asset Purchase Agreement ("APA"); because there is no evidence that Pechter's was unable to satisfy its own withdrawal liability; and because there is no continuity of operations between Pechter's and RP. (*See generally* RP's Moving Br.).  In opposition, and in support of their cross motion, Defendants argue that RP misstates the controlling successor liability standard, which only requires prior notice of the liability and continuity of the seller's operation, and not a showing of "cheating"; that RP had notice of Pechter's withdrawal liability obligation prior to the asset sale; and there was sufficient continuity of operations between Pechter's and RP after the asset sale for a finding of successor liability.  (*See generally* Fund's Opp. Br.).  The Court denies the parties' cross motions for the reasons below.

**III.    Legal Standards**

**A.    Summary Judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  A

genuine issue of material fact exists for trial when—in viewing the record and all reasonable inferences drawn from it in the light most favorable to the non-movant—a reasonable finder of fact could return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "To be material, a fact must have the potential to alter the outcome of the case." *DeShields v. Int'l Resort Props.*, No. 11-2672, 2012 U.S. App. LEXIS 3580, at *5 (3d Cir. Feb. 23, 2012) (internal citation omitted).

The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); *Celotex*, 477 U.S. at 324; *Azur*, 601 F.3d at 216.  Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  A scintilla of evidence in support of the non-movant's position is insufficient to oppose a summary judgment motion successfully; instead, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." *Anderson*, 477 U.S. at 255.  The summary judgment standard is not affected when the parties file cross motions for summary judgment.  *See Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir.1987).

**B.    Withdrawal and Successor Liability**

ERISA is designed "to protect plan participants and their beneficiaries." *Einhorn v. M.L. Ruberton Constr. Co.*, 632 F.3d 89, 96 (3d Cir. 2011) (internal citations omitted).  The

- 4 -

Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") addresses "'the adverse consequences that result when individual employers terminate their participation or withdraw' from multiemployer pension plans." *Id.* (citing *Supervalu, Inc. v. Bd. of Trs., et al.*, 500 F.3d 334, 336 (3d Cir.2007)).   The MPPAA requires an employer who withdraws from a multiemployer pension plan to pay withdrawal liability, which represents the fund's "unfunded vested benefits." 29 U.S.C. §§ 1381, 1382(3), 1399(b)(1)(B).  The plan sponsor first determines if the employer has withdrawn.  29 U.S.C. § 1381.   Next, the plan sponsor will notify the employer of the amount of the alleged withdrawal liability. 29 U.S.C. §§ 1382(2), 1399(b)(1)(A)(i).   After notification, within ninety days, the employer may seek a review of the amount.  29 U.S.C. § 1399(b)(2)(A)(i).   If any dispute remains, either party may initiate arbitration.  29 U.S.C. § 1401(a)(1).   If neither party initiates arbitration, then the amounts immediately become due and owing and subject to collection.  29 U.S.C. § 1401(b)(1).

For purposes of the parties' cross motions for summary judgment, the critical issues relate to successor liability under ERISA.  The Third Circuit has set forth a two-part test for whether an asset purchaser could be held liable on a theory of successor liability:

> [A] purchaser of assets may be liable for a seller's delinquent ERISA fund contributions to vindicate important federal statutory policy where [1] the buyer had notice of the liability prior to the sale and [2] there exists sufficient evidence of continuity of operations between the buyer and seller.

*Einhorn*, 632 F.3d at 99 (adopting Seventh Circuit's rule in *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323 (7th Cir.1990)).   "The inquiry should be effectuated on a case by case basis balancing the equities presently before the court."  *Id.*[1]

---

[1] On July 18, 2011, this Court held, "Defendants can seek to hold Plaintiff liable for Pechter's withdrawal liability under a theory of successor liability."  *RP Baking LLC v. Bakery Drivers & Salesmen Local 194*, No. 10-3819, 2011 WL 2912861, at *3 (D.N.J. July 18, 2011) (D.E. 38).   In that Opinion, the Court reasoned that although *Einhorn* "deals with the issue of successor liability in the context of delinquent payments, the Third Circuit favorably cited a District of Utah case which permitted successor liability in the context of withdrawal liability."  *Id.* (citing *Trs. of the Utah Carpenters' & Cement Masons' Pension Trust v. Daw, Inc.*, No. 07-87, 2009 WL 77856, at *3 (D. Utah

IV.    **Discussion**

A.    **Notice**

Prong one of the analysis is satisfied where "the buyer had notice of the liability *prior* to the sale." *Einhorn*, 632 F.3d at 99 (emphasis added).  The rationale underlying the prior notice requirement is that the purchaser-successor should have sufficient notice to build the predecessor-seller's debts into the sale price.  *See id.* 97-98 ("In the context of an asset sale . . . . [t]he successor-purchaser would have incentive to inquire about the seller's previous liabilities to negotiate for a lower purchase price.  The predecessor-seller would have incentive to disclose debts and find workable solutions during the sale to release itself from liability and avoid protracted dispute.").  Additionally, the Third Circuit has made clear that "the notice inquiry centers on whether the buyer knows about the *debts*, not whether the buyer knows that the funds intend to seek recovery from it."  *Einhorn*, 632 F.3d at 99 (emphasis added) (citing *Artistic Furniture*, 920 F.2d at 1329).

Therefore, the critical question in this case is whether RP had sufficient notice of Pechter's existing withdrawal debts prior to the asset sale such that RP could negotiate the amount of those debts into the purchase price.  This question can only be answered if the following material facts are undisputed in the record: (1) the date of the asset sale; (2) the date of Pechter's withdrawal from the fund; and (3) if the date of Pechter's withdrawal from the Fund

Jan. 7, 2009) ("A successor company may be charged with the predecessor's withdrawal liability.")).  Other courts, including the Seventh Circuit, whose rule and rationale the Third Circuit adopted, have also held that withdrawal liability can give rise to successor liability.").  *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Express., Inc.*, 223 F.3d 483, 492 (7th Cir. 2000) ("Cases construing the MPPAA have held that successors in non-exempt sales may be liable for withdrawal liability."); *Artistic Carton Co. v. Paper Indus. Union Mgmt. Pension Fund*, 971 F.2d 1346, 1352 (7th Cir. 1992) ("[Section 4204] identifies conditions under which 'withdrawal' does not occur, and under which the trust therefore may not assess withdrawal liability against the old owner.  It creates an immunity for sellers that meet its conditions.  It does not create any immunity for buyers under any circumstances.").  Additionally, the rule comports with the Third Circuit's statement that "[w]e have recognized that because ERISA and the MPPAA are remedial statutes, they 'should be liberally construed in favor of protecting the participants in employee benefit plans.'"  *Einhorn*, 632 F.3d 89, 98 (3d Cir. 2011) (quoting *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir.1986)).

was prior to the date of the asset sale, that RP knew or should have known about Pechter's withdrawal debts.[2]  The record is clear as to (1), but unclear as to (2) and (3).

### 1.    The Date of the Asset Sale

The record is clear with respect to the opening and closing dates of the sale.  On or about May 5, 2006, RP and Pechter's entered into the APA.  (RP's Reply SOF ¶ 39; APA at 1 ("This asset purchase agreement . . . is dated as of May 5, 2006 . . . .")).  On June 26, 2006, the sale closed.  (RP's Reply SOF ¶ 39 (noting RP and Pechter's agreement on these dates)).  The next question is the date of Pechter's withdrawal from the fund.

### 2.    The Date of Pechter's Withdrawal from the Fund

The date of Pechter's withdrawal—the critical fact in this case—is unclear from the record.  The parties generally agree that Pechter's withdrawal took place "in June 2006," but the parties do not state whether the withdrawal occurred over time or on a precise date; if it occurred on a precise date, when exactly it occurred; whether the withdrawal unfolded over the whole month of June; when Pechter's operations officially ceased; by what process the withdrawal or cessation occurred; or, finally, via what documents or discussions.  (*See, e.g.*, Fund's Responses to RP's Proposed Joint Stipulations, D.E. 43-3, "Fund's Resp. Joint Stip." ¶ 19).  For example, the Fund's November 16, 2007 withdrawal liability demand letter to Pechter's merely states that Pechter's "ceased covered operations due to a sale of assets *in June 2006*."  (*See* Letter from Ellen Romano, Fund Manager, Bakery Drivers and Salesmen Local 194 and Industry Pension Fund to James T. Kourgelis, Pechter's Baking Group, LLC, Ex. 1 to Second Declaration of Edward McCausland dated July 27, 2011, D.E. 43-3, "Second McCausland Decl.").  Similarly, the letter's attached schedule, "Withdrawal Liability Calculated Under the Plan's Formula for:

---

[2] "Notice can be proven not only by pointing to facts that conclusively demonstrate actual knowledge, but also by presenting evidence that allows the fact finder to imply knowledge from the circumstances."  *Artistic Furniture*, 920 F.2d at 1329 (citing *Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 173 (1973)).

Pechter's," indicates that the date of withdrawal was "[d]uring [the] 2005-2006 plan year." (*Id.*). Thus, the specific process, or precise date of withdrawal, is unclear.

The withdrawal date is critical because it clarifies the sale's timeline with respect to notice of withdrawal liability. For example, if the withdrawal took place on June 1, 2006, then presumably, RP could have built the then-existing debt into the purchase price. If Pechter's withdrew on June 27, 2006, the day after the sale closed, then RP could not have built the debt into the sale price (as, indeed, the debt would not have existed at the time of the closing).[3] If the withdrawal took place on June 26, 2006, contemporaneously with the closing of the sale, deeper inquiries into Pechter's plans for withdrawal before that date would be required (*e.g.*, what were Pechter's plans for withdrawal; were they known to RP; what level of diligence was conducted; and on what timeline). And finally, if the withdrawal unfolded over the course of June 2006—for example, in a series of agreements, transactions, discussions, or documents—then the Court would need information as to the specifics to assess whether RP had sufficient notice to build them into the sale price. The problem with the present record is that the parties have not provided the Court with sufficient facts to make a clear determination in connection with the sequence of events.

### 3.        The Sequence of Events

Finally, if the parties were consistent on whether Pechter's withdrawal from the Fund took place before or after the asset sale, the Court could at least infer whether any debts existed

---

[3] This presumption, of course, would be subject to the parties' good faith and diligence. A purchaser would lack good faith, for example, where, during the deal period, it secured an indemnity from a seller that it knew to be insolvent. Likewise, a purchaser would lack diligence where it made absolutely no effort to locate a discoverable withdrawal debt that existed prior to the sale. Although the parties appear to address these concepts in their briefs, (*see* RP's Reply Br. at 8 (predecessor's ability to pay); Fund's Opp. Br. at 19-20 (diligence)), the Court finds it inappropriate to discuss them where, as here, the parties have not even provided the Court with the critical dates in the sale's timeline or the specifics surrounding Pechter's withdrawal.

- 8 -

before the sale and what preparations were made to ensure that the Fund was to be paid; however, the parties' statements are inconsistent regarding this sequence.

Some of the parties' statements do appear to indicate agreement as to the sequence of events. For example, in the Fund's April 18, 2011 responses to RP's proposed joint stipulations, the Fund admits, "[b]efore the APA was executed in June 2006, Pechter's had not incurred any withdrawal liability to [the] Fund." (Fund's Resp. Joint Stip. ¶ 19; *see also* Declaration of Edward McCausland dated April 29, 2011, D.E. 43-3, "First McCausland Decl." ¶ 4 ("Before and during the execution of the [APA] between RP and Pechter's in June 2006, RP had no knowledge that Pechter's had incurred withdrawal to the [Fund].").  Additionally, RP's September 7, 2011 response to the Fund's statement of additional material facts demonstrates that the parties do not dispute the following statement: "*As a result* of this asset sale, the Fund determined that in June 2006, Pechter's affected a 'complete withdrawal' from the Fund." (RP's Reply SOF ¶ 40 (citing Sidoti Decl. ¶ 7)) (emphasis added).  Reading these statements together, the Court could infer that Pechter's withdrawal debts did not exist before the asset sale because Pechter's only withdrew "as a result of" (*i.e.*, after) the asset sale.  However, basing a summary judgment decision on the Court's inference from two vague statements would be inappropriate, especially where, as here, the record injects further confusion into the sequence of events.

Most notably, the Fund argues that because RP sought indemnity provisions related to any withdrawal liability of Pechter's, the contractual provisions themselves demonstrate that RP "*did know* about Pechter's withdrawal liability" before the asset sale.  (Fund's Reply Br. at 5 ("More importantly . . . the provisions that RP added to the APA unambiguously demonstrate that it *did know* about Pechter's withdrawal liability.") (emphasis added)).  Specifically, the Fund argues that in an April 11, 2006 email to Pechter's counsel, RP's counsel proposed adding

provisions to the draft APA disclaiming any assumption by RP of withdrawal liability incurred by Pechter's and indemnifying RP for any such withdrawal liability. (Fund's Opp. SOF ¶¶ 54(a), (b) (citing April 11, 2006 Email from Arthur Schatten to John Maloney and Natalia Cavaliere, attached to Fund's Opp. SOF as Ex. 3)). Subsequently, the requested provisions made their way into the final APA. (*See id.* ¶ 55(a), (b) (citing APA § 1.03 ("Notwithstanding anything to the contrary contained herein, [RP is] assuming no liability or successor responsibility for any withdrawal liability . . . incurred by [Pechter's] under the provisions of the Employee Retirement Income Security Act of 1974 . . . .") and § 10.01 ("Seller Group Entity [including Pechter's] agrees, jointly and severally, to indemnify, defend, and hold harmless the Purchaser Group [including RP] . . . from and against any and all losses, liabilities, claims, actions, damages, and expenses [related to] . . . (v) any Withdrawal Liability of Seller arising by reason of Seller's discontinuance of contributions to any multi-employer pension fund."))). The Fund asserts that the email and the resulting contractual provisions demonstrate RP's pre-sale knowledge of Pechter's withdrawal liability. Importantly, the Fund's assertion conflicts directly with its contrary assertion above, that, before the APA was executed in June 2006, Pechter's had *not* incurred any withdrawal liability.

Other statements by the parties contribute to the record's lack of clarity as to sequence. For example, the following dispute in the parties' statements of material facts add yet another layer of obfuscation to the seemingly straightforward question of which came first, Pechter's withdrawal or the sale of assets:

- **The Fund's Statement of Additional Material Fact**: "*Before* the APA was executed, RP knew of the *possibility* of Pechter's future withdrawal liability to the Fund." (Fund's Opp. SOF ¶ 52 (citing RP's January 11, 2011 Responses to Fund's First Set of Interrogatories (RP's Resp. Rogg.) No. 2)).

- **RP's Response to the Fund's Statement**: "This fact is disputed.  RP knew of the possibility of Pechter's future withdrawal liability *when* the APA was executed."  (RP's Reply SOF ¶ 52 (citing RP's Resp. Rogg. No. 2)).

This dispute injects confusion in two ways.  First, RP's response—that RP knew of the possible liability "when" the APA was executed—highlights RP's sequential dispute with the Fund, which claims that RP had knowledge "before" the APA was executed.  Specifically, it is unclear if "before" means before May 5, 2006 when the sale opened, June 26, 2006 when the sale closed, or sometime in between.  Likewise, it is unclear which date RP references with the word "when."

The second type of confusion created by the parties' conflicting statements involves the word "possibility."  It is unclear to the Court what the Fund means by the "possibility of Pechter's future withdrawal liability."  Interpreted one way, the statement could mean that, before the APA was executed (for example, on April 11, 2006 when RP's counsel emailed Pechter's counsel regarding indemnification), RP knew that Pechter's might withdraw before the sale closed on June 26, 2006.  This interpretation might support an argument for notice if the proper facts were adduced at trial.  Interpreted another way, however, the statement could mean that RP knew that Pechter's might withdraw at some point in the future, long after the sale closed.  This interpretation would provide weaker support for a notice argument, in light of the Third Circuit's statement that the notice inquiry relates to "debts."  *See Einhorn*, 632 F.3d at 99 ("[T]he notice inquiry centers on whether the buyer knows about the *debts*, not whether the buyer knows that the funds intend to seek recovery from it.") (emphasis added).  At this stage of the litigation, based upon the present record, the Court will not guess at the parties' meaning.

More importantly, the Court will not decide a $5.4 million case without more information from the parties as to the date of withdrawal and the information exchanged between the parties before and after that date with respect to withdrawal liability.  Because the Fund has the burden

of proving both notice and continuity to establish its claim of successor liability, the Court's finding of a genuine issue of material fact as to notice precludes summary judgment for the Fund.   Accordingly, the Fund's cross motion, (D.E. 51), is denied.   Because RP need only establish the absence of notice *or* continuity, the Court reaches the issue of continuity below, finding that RP has not satisfied its burden.

### B.   Continuity

The second prong of *Einhorn* turns on whether "there exists sufficient evidence of continuity of operations between the buyer and seller."   *Einhorn*, 632 F.3d at 99.   The *Artistic Furniture* test for continuity adopted by the Third Circuit "look[s] to, *inter alia*, the following factors: [1] continuity of the workforce, [2] management, [3] equipment and location; [4] completion of work orders begun by the predecessor; and [5] constancy of customers."   *Id.* (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987) and *Artistic Furniture*, 920 F.2d at 1329).   The factors are non-exhaustive.   Instead, the continuity inquiry is fact-specific and should be based on the totality of the circumstances.   *See Fall River*, 482 U.S. at 43 ("This approach [to successor liability] . . . is primarily factual in nature and is based upon the *totality of the circumstances* of a given situation . . . .") (emphasis added).

Below, the Court takes a factor-by-factor approach to the continuity analysis, pointing out the disputed issues where they exist within a factor.   The Court then finds that neither RP nor Pechter's has satisfied its moving burden of establishing that no genuine issue of material fact exists as to continuity.   Therefore, summary judgment is not appropriate for either party.

### C.   *Einhorn* Factor One: Continuity of Workforce

The Fund points to the following facts to demonstrate that Pechter's workforce continued with RP following the APA: On or about June 26, 2006, RP hired Pechter's "Employees" as that

term is defined in the APA, (Fund's Opp. SOF ¶ 78; RP's Responses to the Fund's Stipulations, "RP's Resp. Joint Stip.," attached as Ex. B to RP's Moving Br), and as of June 30, 2007 (just over a year after the APA), approximately 91% of RP's employees previously worked for Pechter's.  Those employees continued to perform substantially the same duties for RP as they had performed while employed by Pechter's.  (*Id.* ¶ 79; *see* RP's Resp. Joint Stip. ¶ 7).

To counter the Fund's showing of continuity in workforce, RP points to the fact that "[b]y July 2011, 71 of RP's 164 employees had never worked for Pechter's."  (Second McCausland Decl. ¶ 3).  Without a more developed record as to the reduction in Pechter's employees continuing at RP following the APA—for example, without knowing how quickly the Pechter's employees left after the APA—it is not possible to determine as a matter of law which party this factor favors.

**D.**   ***Einhorn* Factor Two: Management**

The Court finds that the record is unclear as to whether RP's management was entirely new following the APA, because one of RP's top three managers worked at Pecther's at some point before 2006.

RP states, "[i]t is . . . undisputed that, immediately after the APA, RP's leadership, consisting of its Managing Member/President (Mr. Battaglia), its Comptroller (Mr. McCausland), and its Director of Sales (Mr. Fascenelli) were all new."  (RP's Moving Br. at 18 (citing RP's Moving SOF ¶¶ 17, 19, 20, 21, 22, 25)).  The record supports these assertions with respect to Mr. Battaglia and Mr. McCausland, but not Mr. Fascenelli.

As to Mr. Battaglia and Mr. McCausland, the Court finds the following portions of the record persuasive in demonstrating that they were part of a new management regime:

- Since the execution of the APA in June 2006, Salvatore Battaglia has served as RP's Managing Member and President, (RP's Moving SOF ¶ 17), Mr. Battaglia is the highest-

ranking employee at RP and is ultimately responsible for everything that RP does, (*id.* ¶ 18), and Mr. Battaglia has never worked for Pechter's.  (*Id.* ¶ 19; First McCausland Decl. ¶¶ 7-8).

- Since the execution of the APA, Mr. McCausland has served as RP's Comptroller, (*id.* ¶ 22), in that capacity he is responsible for examining RP's accounts, keeping its records, and periodically reporting RP's financial situation to its members, (*id.* ¶ 23), and Mr. McCausland, like Mr. Battaglia, has never worked for Pechter's.  (*Id.* ¶ 25; First McCausland Decl. ¶ 8).

However, the record indicates that Mr. Fascenelli worked at Pechter's sometime before 2006, undercutting the notion that RP's management was entirely new following the APA.  (*See* First McCausland Decl. ¶ 9 ("At no point *in* 2006 did Mr. Fascenelli work for Pechter's") (emphasis added); Fund's Opp. SOF ¶ 21 ("Mr. Fascenelli worked for Pechter's at some point before 2006.")).

The issues of whether Mr. Fascenelli worked at Pechter's before 2006, how long, in what capacity, and with what authority are significant because they would answer the question of whether RP's leadership could be considered "new" (and therefore discontinuous with Pechter's) following the APA.  The portions of the record that the parties point to do not answer these questions, which are especially important given Mr. Fascenelli's role at RP following the APA. According to RP, all significant decisions at RP are made by RP's President, Salvatore Battaglia, its Director of Sales, Laurence Fascenelli, or its Comptroller, Ed McCausland.  (RP's Moving SOF ¶ 16).  Additionally, since the execution of the APA, Laurence Fascenelli has served as RP's Director of Sales and, in that capacity, he is ultimately responsible for all sales-related activity, including marketing and maintaining the relationship with RP's distributors.  (*Id.* ¶ 20). Therefore, knowing Mr. Fascenelli's role at Pecther's, compared to his role at RP, is a significant consideration in determining whether Pechter's management carried through to RP via Mr.

Fascenelli.  On the portions of the record indicated by the parties, this determination cannot be made at this stage as a matter of law.

### E.    *Einhorn* Factor Three: Equipment and Location

The following facts favor the Fund's continuity argument on this factor:

- On or about June 26, 2006, under the APA, RP acquired Pechter's "Machinery and Equipment" as those terms are defined in the APA and described in Schedule 1.01(b). (RP's Reply SOF ¶ 66).

- After the Closing and through at least July 2007, RP continued to use substantially all of the "Machinery and Equipment" as those terms are defined in the APA and described in Schedule 1.01(b) of the APA.  (*Id.* ¶ 67).

- After the Closing, RP assumed the manufacture, sale, and distribution of baked goods from the Property, as defined in the APA.  (*Id.* ¶ 60 (citing Ex. B: RP's Resp. P.3 ¶ 2); *see also* APA ("[S]imultaneously with the Closing . . . of the transaction contemplated in this Agreement, Harrison shall lease to RP Real Estate the real estate, as more particularly described in Schedule A attached hereto [listing lots] . . . , currently owned by Harrison and occupied by Seller in connection with the operation and conduct of the Business."))

Based on the above, the Court does not find meaningful disputes in the record as to this factor.

### F.    *Einhorn* Factors Four and Five: Completion of Work Orders
###        Begun by Predecessor

The Court finds that these factors favor the Fund's continuity argument.  The Fund contends that "[a]fter the Closing and through at least July 2007, RP filled work orders originally received by Pechter's, (RP's Resp. Joint Stip. ¶ 17), and during the same time period "RP delivered the same or similar products as Pechter's delivered before the Closing to the same customers."  (*Id.* ¶ 18).  RP disagrees with these characterizations, explaining that, "[a]fter the Closing RP filled work orders originally received by Pechter's," (*id.* ¶ 18), and "[a]fter the Closing and through at least July 2007, RP's distributors delivered many of the same or similar products as did Pechter's distributors before the Closing."  However, based on the following facts, the Fund has the better argument under this factor:

- 15 -

- After the Closing, RP completed in the ordinary course of business all work orders that were originally received by Pechter's.  (Fund's Opp. SOF ¶ 100 (citing Ex. E: RP's Supp. Resp. p.4 ¶ 27)).

- In the APA, RP assumed Pechter's "Assumed Contracts," "Contracts with Schools and Institutions," "Distributorship Agreements," "Union Contracts," and "Drivers Notes." (Fund's Opp. Br. at 25 (citing Fund's Opp. SOF ¶¶ 81-93)).

- After the Closing, and through at least July 2007, substantially all of Pechter's former baking operations customers continued to be RP's customers.  (Fund's Opp. SOF ¶ 74 (citing Ex. B: RP's Resp. p.4 ¶ 5(a) (defining "Baking Operations" as Pechter's "Business" as that term is defined in the APA))).

- After the Closing and through at least July 2007, substantially all of RP's distributors were Pechter's former distributors, (*id.* ¶ 75 (citing Ex. B: RP's Resp. p.4 ¶5(b))), the distributors delivered substantially the same products as Pechter's distributors delivered before the Closing to substantially the same customers, (*id.* ¶ 76 (Ex. E: RP's Supp. Resp. p.5 ¶ 29)), and substantially all of RP's suppliers were Pechter's former suppliers. (*Id.* ¶ 77 (Ex. B: RP's Resp. p.5 ¶ 5(c))).

Based on the above, the Court does not find meaningful disputes in the record as to this factor.

### G.     Additional Relevant Factor: Continuity of Ownership

The Court finds that ownership is a relevant consideration on the facts of this case, and that the ownership factor favors RP's showing of discontinuity.

Although *Einhorn*'s continuity analysis does not explicitly include ownership as a factor, the Third Circuit noted that its enumerated list of factors was not exhaustive.  *See Einhorn*, 632 F.3d at 99 (considering enumerated factors, "*inter alia*").  On the facts of this case, in which some of the enumerated factors demonstrate continuity, some demonstrate discontinuity, and others contain genuine issues of material fact, it would be unwise for this Court to overlook additional considerations relevant to the determination.  In fact, cases considering successor liability in the withdrawal liability context have considered ownership as a relevant and persuasive factor.[4]

---

[4] The Fund argues, "ownership is not a relevant continuity factor in the Third Circuit," because "*Einhorn* clearly stated that the federal successor standard does not require commonality of ownership."  (Fund's Opp. Br. at 28).

For example, in *Trustees of Utah Carpenters' & Cement Masons' Pension Trust v. Daw, Inc.*, cited with approval by the Third Circuit in *Einhorn*, the court found successor liability in the withdrawal liability context where, among other continuity factors, one of the predecessor's principals, Ryan Daw, continued as a management level employee at the successor company, and, in fact, actively participated in management.  No. 07-87, 2009 WL 77856, at *3 (D. Utah Jan. 7, 2009).  In *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc.*, the Seventh Circuit found that the facts in the record "suggest[ed] both notice and continuity," in part, because "New Tasemkin was owned by the daughter-in-law of Old Tasemkin's owner, Irving Steinberg, [and] Steinberg's son Leslie, formerly the registered agent for Old Tasemkin, was New Tasemkin's president and secretary." 59 F.3d 48, 49 (7th Cir. 1995).  Likewise, in *Central Pennsylvania Teamsters Pension Fund v. Bear Distributing Company, Inc.*, the court found that "there [wa]s ample evidence in the record to establish that Sheffer Beer is a successor in interest to Bear, and thus liable for Bear's obligations to the Pension Fund," in part, because "the two companies are related entities though family ownership."  No. 07-3554, 2009 WL 812224, at *9 (E.D. Pa. Mar. 26, 2009).  Finally, in *Central States, Southeast & Southwest Areas Pension Fund v. Wiseway Motor Freight, Inc.*, the court found that "[t]he identity of ownership between [predecessor] and [successor] . . . underscores the continuity of business," because the predecessor's three primary shareholders (including its president and controller) each went on to acquire a third of the successor's stock in addition to comprising the successor's board of directors.  No. 99-4202,

---

The Court agrees that the Third Circuit clearly stated that the federal successor standard does not require a finding of common ownership, but this does not mean, however, that such a finding is not *relevant* to the Court's consideration of factors in the totality.   *See Fall River*, 482 U.S. at 43 ("This approach [to successor liability] . . . is primarily factual in nature and is based upon the *totality of the circumstances* of a given situation . . . .") (emphasis added).

2000 WL 1409825, at *3, *5-6 (N.D. Ill. Sept. 26, 2000).  Taken together, these cases persuade the Court that ownership is a relevant consideration.

In this case, it is undisputed that, following the APA, RP had completely different ownership than that of Pechter's.  (Fund's Opp. SOF ¶ 14; *see also* First McCausland Decl. ¶ 6 ("RP Baking has five owners.  None of those owners ever was an owner of Pechter's."); Ex. D to RP's Moving Br., Second McCausland Decl. ¶ 2 ("Immediately after the execution of the APA, RP had completely different ownership than that of Pechter's.")).  Here, unlike in *Tasemkin* or *Bear*—where one family-owned entity morphed into another—and unlike in *Daw* or *Wiseway*— where former owner-leaders at the old company became owner-leaders at the new company— RP's ownership (and, as discussed above, its leadership) was new and different, with the potential to take the company in a new direction.

### H.    Additional Relevant Factor: Changes to Product Lines

The Court finds that this factor is relevant on the facts of this case and that the record contains inconsistencies as to which party this factor favors.

RP and the Fund dispute whether RP "maintained Baking Operations substantially similar to Pechter's Baking Operations."  (RP's Resp. Joint Stip. ¶ 16).  This fact is significant because a continuation of Pechter's baking operations, product lines, and recipes would support a showing of business continuity, whereas a departure from Pechter's product lines and operations would signify a new direction for RP's core business activities following the APA.

RP argues that it did not continue Pechter's business because "[a]lthough RP produced many of the same products as did Pechter's, between June 2006 and 2008, RP discontinued and disabled Pechter's bagel, hamburger bun, and hotdog bun product lines," (RP's Moving SOF ¶ 26), and "RP also began producing a different line of white and wheat bread than did Pechter's."

(*Id.* ¶ 27; RP's Resp. Joint Stip. ¶ 16).  The Fund disputes whether changing these product lines is material "because RP has admitted that after the Closing, as that term is defined in the APA, RP's distributors delivered substantially the same products as Pechter's distributors delivered before the Closing to substantially the same customers."  (Fund's Opp. SOF ¶ 26 (citing RP's Supp. Resp. p.5 ¶ 29)).  The Fund also disputes the discontinuity of baking operations by pointing to RP's admission that RP maintained operations substantially similar to Pechter's "Baking Operations" as defined in the APA.  (*Id.* (citing RP's Supp. Resp. p.5 ¶ 28)).

The Court finds, however, that the definition of "Baking Operations" in the APA lacks the specificity that the Court would need to determine whether the purported product line departures asserted by RP are sufficient to demonstrate a lack of continuity, or to gauge the magnitude of the departure over Pechter's product lines.  The APA defines Pechter's business generally: "[Pechter's] is in the business of the manufacture, sale and distribution of baked goods (the 'Business') . . . ."  (APA at 1).   Also, the parties' statements of material fact only assert that Pechter's was a commercial bakery that supplied bread, rolls, and pastries to much of the New York metropolitan area.   (Fund's Opp. SOF ¶ 1).  These general statements fall short of indicating to the Court the significance of the product line departures asserted by RP, and the parties point to nothing in the record that could help the Court make this determination.   For example, RP fails to point to anything in the record demonstrating that these changed items were Pechter's core products, and thus, that changing them represented RP's new direction.  Similarly, the Fund fails to point to anything in the record demonstrating that these changes were trivialities, or that these changes were minor compared to RP's mere continuation of other Pecther's product lines for which Pechter's was known.  Such facts would be required for the

Court's determination as a matter of law.  Their absence lends support to the Court's denial of the parties' cross motions for summary judgment.

###   I.        Balancing the Factors

Evaluating the factors in the totality, the Court determines that neither cross movant has satisfied its moving burden of establishing that no genuine issue of material fact exists as to the issue of continuity, a necessary element of a claim for successor liability.  As to *Einhorn* factor one—continuity of workforce—additional questions as to the timeline of the departure of Pechter's employees following the APA are relevant, and without answers to those questions, the Court is unable to determine conclusively which party this factor favors.  Although *Einhorn* factor two—management—appears to favor RP's discontinuity argument, it is impossible at this point for the Court to make a determination with any certainty without knowing more about Mr. Fascenelli's history at Pechter's prior to 2006, before he became one of the top three managers at RP following the APA.  Factors three, four, and five—equipment and location, completion of work orders begun by the predecessor, and constancy of customers—are more straightforward on the record before the Court at this time, and each factor appears to favor the Fund's continuity argument.  The first additional factor that the Court has considered—ownership—favors RP's discontinuity argument.  Finally, the second additional factor—similarity in product lines— contains disputed issues as to whether and to what extent RP's changes to Pechter's product lines and recipes demonstrate a discontinuity in business operations.

Given the split of factors—in addition to the disputed issues within some of the factors considered by the Court—it is neither possible nor appropriate for the Court to rule on the issue as a matter of law at the summary judgment stage.  Stated differently, the Court is unable to determine as a matter of law which of the parties' respective theories of continuity is more

credible: on the one hand, RP's theory of discontinuity, that after the APA, new management and new ownership took existing assets in a new direction; or, on the other hand, the Fund's theory of continuity, that post-APA RP was the spitting image of predecessor Pechter's everywhere but at the very top.   At the summary judgment stage, the role of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Here, there is a genuine issue for trial.  "Given the current state of the record, the presence of this factual dispute renders summary judgment at this juncture for either party inappropriate." *Artistic Furniture*, 920 F.2d at 1330.

## V.    Conclusion

For the foregoing reasons, the Court will deny the parties' cross motions for summary judgment.  An accompanying Order will follow.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**